BUDDY T. HAYNES and SUE ELLEN HAYNES, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Haynes v. Commissioner
Docket No. 11759-79.
United States Tax Court
T.C. Memo 1981-709; 1981 Tax Ct. Memo LEXIS 28; 43 T.C.M. (CCH) 99; T.C.M. (RIA) 81709; December 17, 1981. Kenneth W. Jennings, Jr., for the petitioners. Larry N. Johnson, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiencies
1974
$ 8,312.74
1975
914.00
The issues for *29 decision are as follows: 1. Whether a restaurant known as the Lobster Pot was owned and operated by petitioner, Buddy T. Haynes, as a sole proprietorship or by a corporation, the Lobster Pot, Inc., in 1974; the answer to this question is determinative of whether petitioner may deduct a loss incurred in the operation of the restaurant as well as a loss from its sale in that year; 2. If the restaurant was owned and operated by petitioner, what is the amount deductible by petitioner as the loss on the sale of the restaurant in 1974. FINDINGS OF FACT Petitioner are husband and wife, and they were legal residents of Renton, Washington, when they filed their petition. Petitioners filed joint Federal income tax returns for 1974 and 1975 with the Ogden Service Center in Ogden, Utah. On March 23, 1972, petitioner Buddy T. Haynes (hereinafter petitioner) and Joyce E. West (West) or "corporation to be formed," as purchaser, entered into an earnest money receipt and agreement with Errol D. Beach, as seller, for the purchase of a restaurant known as "Beach Boys Inn." The purchase price of the business was $ 57,000, composed on a cash down payment of $ 16,530 (including $ 5,000 earnest *30 money) and the assumption of the liabilities of the seller in the amount of $ 35,000. The remaining balance of $ 5,470 was payable by the purchaser at the rate of $ 200 or more per month until paid in full, with interest to accrue on the unpaid balance at the rate of 6 percent. On March 27, 1972, petitioner and West filed with the Washington Department of State articles of incorporation for The Lobster Pot, Inc., (sometimes hereinafter the Corporation). One of the stated purposes of the Corporation was to operate restaurants and cocktail lounges. The three directors listed in the articles of incorporation were petitioner, West, and Judy Ruddach. The Corporation continued in existence until it ceased to exist by operation of law on July 1, 1977, for failure to pay the annual license fee for three successive years. On April 28, 1972, the purchase of the restaurant business was closed pursuant to the terms of the March 23, 1972, earnest money receipt and agreement. The closing papers designate Lobster Pot, Inc., as the purchaser. An instrument designated as a bill of sale was executed on behalf of the Corporation by petitioner as president and was acknowledged under date *31 of May 20, 1972. The instrument states that the restaurant was sold on that date by the Corporation to petitioner as an individual. The instrument recites that in "the case of a sale of the business by purchaser [petitioner] at any time seller [the Corporation] agrees to cooperate and to sign any andoall documents pertaining to the sale * * * or licenses pertaining to its operatioin * * *." The instrument adds that "as a condition of this sale" the purchaser is authorized to continue the use of bank accounts in the name of the Corporation. Further, the purchaser was authorized to continue operating the business for two years under all existing licenses, including the cocktail lounge license. Under date of May 16, 1972, petitioner as "sole remaining Director and officer" of the Corporation had adopted a resolution authorizing the sale and accepting the verbal resignation of West as director, treasurer and manager of the Restaurant as well as the resignation of Judy Ruddach as director of the Corporation. On June 30, 1972, stock certificates 1 and 2 for 250 shares each of nonpar common stock of the Corporation were issued to petitioner and West, respectively. The stock certificates *32 were signed by petitioner as president and West as secretary of the Corporation. The reverse side of stock certificate No. 2 states that on November 22, 1972, the 250 shares represented thereby were transferred to petitioner. The restaurant business, known as the Lobster Pot (hereinafter the Restaurant), was in operation from April 1972 to November 1972 and from April 1973 to November 1973 but was closed from November 1972 to April 1973. The primary activities of the Restaurant were the sale of food and alcoholic beverages, the operation of a ukulele bar, and the performance of topless go-go dancing. On May 1, 1972, the Corporation applied for and received a certificate of registration with the Department of Revenue, State of Washington, as owner of the Restaurant. During the entire period the Restaurant was in operation, the Corporation filed monthly Combined Excise Tax Returns (SF 2406) with the Department of Revenue reporting liability for and paying State business and occupation taxes and State and county sales taxes. At no time following registration of the Corporation as owner of the Restaurant was the Department of Revenue notified of any charge in ownership of the *33 Restaurant. No returns were filed and no taxes were paid for the Restaurant by petitioner or anyone else as an individual. Similarly, King County, in which the Restaurant was located and conducted its business, assessed personal property taxes for 1973 against the Corporation for property it owned and used in the business in that year. No assessments were made against petitioner as an individual for that property in 1973 or 1974. On April 27, 1972, the Washington State Liquor Control Board (sometimes Board or Liquor Control Board) approved the issuance of a Class H liquor license to the Corporation. A Class H. liquor license may be issued to the owner of a bona fide restaurant, and it permits the sale for on-premise consumption of spirituous liquor, beer, and wine. Only the entity to which the license is issued may legally use the liquor license. On May 26, 1972, the Corporation, by West as secretary, applied for reissuance of the Class H liquor license to the Corporation for the fiscal year beginning July 1, 1972. West as Treasurer of the Corporation supplied additional information to the Board on the Restaurant's operations in a letter dated June 7, 1972. The license *34 was reissued to the Corporation on July 1, 1972, effective through June 30, 1973. On June 1, 1973, petitioner as president of the Corporation applied for a reissuance of the Corporation's Class H liquor license. The application designated petitioner and West as officiers of the Corporation and designated the Corporation as the "owner" of the restaurant's "furniture, fixtures or equipment." The application answered "No" to a question as to whether "any person other than the applicant" is to share in the profits or losses of the business. The Board reissued the liquor license to the Corporation on July 1, 1973, effective through June 30, 1974. No application was filed with the Liquor Control Board for the transfer of the liquor license from the Corporation to petitioner as an individual, and no liquor license was issued to him. The Board was not informed (as its regulations direct) of the resignation of West as a director or officer of the Corporation or of any transfer of the assets of the Corporation to petitioner individually. During 1973 other documents were signed on behalf of the Corporation by petitioner as its president and were filed with the Liquor Control Board, *35 including applications for approval of managership changes. All of these documents show the Corporation as the licensee. In January 1974, the Corporation was charged with violation of the Liquor Control Board regulations. The alleged violations consisted of making management changes without prior written consent of the Board, permitting go-go dancing without written consent of the Board, and changing the physical setup and arrangement of the premises without written consent. A hearing was scheduled by notice to the Corporation, and the Corporation's liquor license was suspended. On December 31, 1973, the Corporation, as seller, and Richard G. Wagner, Inc., (Wagner) as purchaser, entered into an earnest money receipt and agreement whereby Wagner offered to purchase the personal property, trade, lease, furniture, fixtures, and equipment owned by the Corporation for a price of $ 32,500. The offer was accepted by petitioner as president of the Corporation. By letter dated February 19, 1974, petitioner as president of the Corporation authorized disbursement to the Small Business Administration and another third party of the funds received from the sale of the Restaurant business *36 to Wagner. The escrow instructions were singed by petitioner as president of the Corporation and the sale of the Restaurant business by the Corporation to Wagner was closed on March 29, 1974. On January 2, 1974, an application signed by petitioner on behalf of the Corporation for the transfer of the liquor license from the Corporation to Wagner was filed with the Liquor Control Board. The application recited that the Corporation was the owner of the furniture, fixtures, and equipment in the Corporation and that the Corporation would hold an encumbrance on the furniture, fixtures, or equipment in the amount of $ 25,000. The license was reissued to Wagner on April 29, 1974. Petitioners did not include with their Federal income tax returns for 1972 and 1973 a Schedule C relating to a trade or business operated as a sole proprietorship. On their Federal income tax return for 1974, petitioners claimed on Schedule C a business loss from the operations of the restaurant in the amount of $ 4,769.68 and on a Supplemental Schedule of Gains and Losses a loss on the sale of the Restaurant in the amount of $ 17,813.27. Respondent determined that in 1972, 1973, and 1974 the Corporation *37 was a viable entity and that neither the losses from the operations of the Restaurant nor from the disposition of the Restaurant are deductible by petitioner in his individual capacity. Alternatively, respondent determined that, if the losses are deductible by petitioner, the allowable loss in the disposition of the Restaurant was $ 7,814. [1]
OPINION To support his determination denying the deduction for the operating loss in 1974, respondent maintains that petitioner does not meet the requirements of section 165(a) and (c)(1) [2] which allows as a deduction any loss sustained in a "trade or business" and not compensated by insurance or otherwise. As to the loss on the sale in 1974 of the Restaurant assets, respondent cites section 1231(a) [3] which provides that if gains do not exceed losses from the sale of assets *38 used in a "trade or business," the losses shall not be considered as losses from the sale or exchange of capital assets, i.e., shall be ordinary losses. Respondent does not deny that losses were sustained. He maintains, however, that the Corporation, not petitioner, owned the Restaurant assets, was engaged in the trade or business of operating the Restaurant, and, therefore, only the Corporation, not petitioner, may deduct the losses. *39 Petitioner pins his entire case on the instrument designated as a bill of sale and signed under date of May 20, 1972. He "admits that he continued to conduct business in the corporate name, under the corporate liquor license, using corporate accounts, and that he ultimately sold the assets in the name of the corporation." He argues, nonetheless, that the May 20, 1972, bill of sale effected a transfer of the assets from the Corporation to petitioner and, as a result, both the operating loss and the loss from the sale of the section 1231 assets are deductible by him. In the light of all the evidence, we hold that respondent's determination must be sustained. The losses in issue were incurred, and may be deducted only, by the Corporation and not by petitioner. It is true that the bill of sale, signed by petitioner as president of the Corporation, whereby all the assets of the Corporation were purportedly sold to petitioner, is dated May 20, 1972, and bears a jurat stating it was acknowledged by petitioner as president of the Corporatioin on that date. We are not convinced, however, that the document was executed on that date. Petitioner testified that West, Judy Ruddach, *40 and another individual named Ben Gettings who worked in the business "had some sort of fight between them" and abandoned the business about hree weeks after it was opened. Judy Ruddach called from Idaho and West called from some undisclosed location, petitioner testified, and told him "by phone that they were abandoning the business" and that they "would discontinue being a director." In the light of that information he testified that in his capacity as sole remaining director, he formally accepted the resignations of West as "a Director, Secretary, Treasurer or Manager" and of Judy Ruddach as a director, in a document dated May 16, 1972, entitled "Unanimous Action of the Board of Directors of the Lobster Pot, Inc." Petitioner further testified that one of the reasons he executed the bill of sale of the Restaurant to himself on May 20, 1972, was that a "lady [West] out there had the stock certificate worth half" of the Corporation's value, and she had abandoned the business. The objective facts show that most of petitioner's testimony in this respect is mistaken. The fact is that the Corporation's stock had not been issued on May 20, 1972. The stock certificate covering one-half *41 of the stock (250 shares) was not issued to West until June 30, 1972, and on that same date a certificate was issued to petitioner for the other half of the stock. West's certificate, sealed and signed by petitioner as president and West as secretary, shows that West assigned the stock to petitioner on November 22, 1972. Moreover, West continued to serve the Corporation after May 20, 1972. As detailed in our findings, on May 26, 1972, West as secretary of the Corporation signed an application for the renewal of the Restaurant's liquor license for the fiscal year beginning July 1, 1972. The application also designated West as manager and stated that the Corporation was "owner of [the Restaurant's] furniture, fixtures or equipment." On June 7, 1972, West signed a letter to the Liquor Control Board as manager and "Sec. Treas." of the Corporation. On June 7, 1972, West signed a statement to the Liquor Control Board agreeing to the Board's conditions on the installation of a ukulele bar. West also signed checks to the State Department of Revenue dated November 1 and 6, 1972. The evidence, therefore, unmistakably shows, contrary to petitioner's testimony, that West had not terminated *42 her relationship with the Corporation before the purported bill of sale of the business to petitioner was allegedly signed and did not do so for months thereafter. Given these inconsistencies between the objective facts and petitioner's testimony, we are left with grave doubts that the purported bill of sale from the Corporation to petitioner was executed on May 20, 1972. We have these doubts despite petitioner's testimony, that of a notary public, and the jurat reciting that the bill of sale was executed on that date. If we were compelled to make a finding on this issue, we would find that the purported bill of sale was not executed until long after May 20, 1972. We need not decide that issue, however, because we have concluded that, regardless of when the bill of sale was actually signed, the purported sale to petitioner was never consummated and the Corporation continued to be the owner of the Restaurant assets and to operate the business. Because petitioner signed the purported bill of sale both in his individual capacity, purportedly as purchaser, and in his capacity as president of the Corporation, purportedly as seller, he alone could decide whether and when the sale *43 would be completed. After May 20, 1972, and continuing to the date of the sale of the business to Wagner, Inc., the Corporation treated the business and the Restaurant assets as corporate assets. The Restaurant's checking account was maintained in the name of the Corporation. Petitioner continued to sign correspondence in the name of the Corporation. As detailed in our findings, all the State excise tax returns and King County personal property assessments for the Restaurant were made in the name of the Corporation. Similarly, all dealings with the Liquor Control Board reflected that the Corporation was the owner of the business and, as noted above, papers filed with the Board contain express representations that the Corporation owned the furniture, fixtures, and equipment used by the Restaurant and that no one else had any interest in the profits or losses of the business. Any transfer of Restaurant assets from the Corporation to petitioner would have required the approval of the Board as a condition to continuing the liquor license, but no such approval was sought. Petitioner testified that he kept the liquor license in the Corporation's name when he executed the May 20, 1972 bill *44 of sale because if he had attempted to transfer it, he would have been required to close the Restaurant pending the issuance of a new license. This was not true. A representative of the Liquor Control Board testified that a business need not be closed in order to have a license transferred to another party. When the Restaurant was sold to Wagner in March 1974, the earnest money receipt and agreement, the escrow instructions, and the escrow statement show the Corporation as the seller and petitioner as its president. Further, a $ 25,000 note given by Wagner as part of the consideration for the sale was made payable to the Corporation. In connection with the sale, the Corporation in a letter dated February 25, 1974, and signed by petitioner as president, authorized the assignment of the lease of the premises on which the Restaurant was located from the Corporation to Wagner. The application for the transfer of the liquor license from the Corporation to Wagner, moreover, represents that the Corporation owned the Restaurant's furniture, fixtures, and equipment prior to the transfer. Finally, petitioner did not include in his income tax returns for 1972 and 1973 any reference *45 to his alleged operation of the Restaurant. For 1972, he deducted $ 8,656 as "Write off worthless note to Lobster Pot, Inc." In his testimony he blames erroneous advice from some unidentified person in the Internal Revenue Service for his failure to report a 1972 loss from the Restaurant's operations. For 1973, he stated that he did not report the tax results of the Restaurant's operations because by that time the Tax Court had decided that he could not do so for 1972. The Tax Court opinion in his prior case for 1972, however, was not issued by this Court until January 27, 1976, long after his 1972 income tax return was filed. , [4] affd. in part and remd. in part per order (9th Cir., July 7, 1977). All these facts convince us that the sale of the Restaurant assets to petitioner was never consummated. *46 Thus, not only do the facts negate every reason given by petitioner for executing the bill of sale on May 20, 1972, they demonstrate that, despite the bill of sale, petitioner continued to treat the Restaurant as owned by the Corporation. Indeed, he repeatedly represented to others that the Corporation owned the Restaurant. At no point before he filed his 1974 income tax return, which was long after the Restaurant had been sold to Wagner, did he indicate to anyone that the Corporation had not owned the business from the beginning in April 1972. Thus, for the entire period prior to the sale to Wagner he enjoyed all the advantages of operating the business through the Corporation. We do not think he can now point to the purported May 20, 1972, bill of sale as evidence that he personally owned the business all along. Even if the bill of sale was signed on May 20, 1972, it is apparent that the sale was never completed. As stated by the Supreme Court in : The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the *47 state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. True, petitioner became the sole shareholder after West departed and he thereafter controlled the Corporation. In , however, the Supreme Court commented that the Court of Appeals for the Second Circuit correctly held-- that under our decisions, when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise. See also , affg. ; , affd. per curiam . The old case of , *48 revg. , on which petitioner relies, is clearly distinguishable. In that case, a previously prosperous corporation ran into hard times following World War I. When the other shareholders declined to advance needed capital, Wiggin agreed in a written employment contract to manage and operate the business. His compensation was to be the net profits, but he was also to pay personally all losses incurred in the operations. The court of appeals held the contract was a valid one and that Wiggin rather than the corporation was entitled to deduct the losses he incurred and paid. The facts in the instant case are entirely different. Petitioner claims to have bought the Corporation's assets on May 20, 1972; in fact, he did nothing but unilaterally sign a paper on some doubtful date and file it away without ever putting it into effect. The purported sale was meaningless, because the Corporation, not petitioner, continued to operate the Restaurant and exercise all rights of ownership. Having reached the conclusion that the Corporation owned and operated the Restaurant in 1974, we need not consider respondent's alternative determination as to the amount *49 of the alleged loss. We note only that petitioner offered no evidence to show error in that determination. [5]
Decision will be entered under Rule 155. Footnotes
1. The computation of the loss of $ 7,814 (respondent's alternative determination) was as follows: ↩
Selling Price
$ 32,500 Verified cost of assets
$ 57,000 Depreciation allowed or
allowable
1972
1973   $ 9,349
1974     2,337
11,686 $ 45,314 Loss allowance by T.C.
(5,000)
(40,314)
Allowable loss
$ (7,814)
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; ↩
3. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule.--If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, * * * and capital assets held for more than 1 year into other property or money, exceed the recognized losses from such sales, exchanges, * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 1 year. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *↩
4. In , affd. in part and remd. in part per order (9th Cir., July 7, 1977), this Court found that petitioner did not operate the Restaurant as an individual in 1972 but that it was owned and operated by the Corporation. By order the decision of this Court was affirmed as to 1972 but the case was remanded by the Court of Appeals for this Court to ascertain whether petitioner was misled by the Internal Revenue Service as to subsequent years. The matter was settled by an agreement by respondent not to raise the affirmative defense of res judicata or collateral estoppel as to the ownership and operation of the restaurant in the years now before the Court. We note, however, that the Court's findings of fact in that case do not mention the bill of sale allegedly executed on May 20, 1972, and purporting to transfer the ownership of the Restaurant assets from the Corporation to petitioner.↩
5. The petition alleges that respondent erred in denying petitioner's claim to the benefits of income averaging under sec. 1301 et seq., but petitioners concede that they do not qualify for those benefits if they are not entitled to the disputed losses with respect to the Restaurant. Our conclusion as to the losses thus resolves also the issue as to income averaging.↩